Diane BETHEL, Plaintiff,

v.

Earl PORTERFIELD, individually and in his official capacity as the Burke County EMA Director or Chief of Burke County EMA; and Burke County, Georgia, through Jimmy Dixon, in his official capacity as Chair of the Burke County Board of Commissioners, Defendants.

No. CV102–005.

United States District Court,
S.D. Georgia,
Augusta Division.

Dec. 19, 2003.

John Paul Batson, Augusta, GA, for Plaintiff.

Mary Anne Ackourey, William H. Buechner, Jr., Freeman, Mathis & Gary, LLP, Atlanta, GA, for Defendants.

## ORDER

BOWEN, Chief Judge.

Plaintiff filed the captioned case asserting claims under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e—2000e–17, and 42 U.S.C. §§ 1983 and 1988. (Doc. Nos.1, 4.) Defendants move for summary judgment on all of Plaintiff's claims. (Doc. No. 24.) For reasons stated more fully below, Defendants' motion is **GRANTED.**

## I. *BACKGROUND*

Plaintiff is a former employee of the Burke County Emergency Management Agency ("BEMA"), where she worked as an emergency medical technician ("EMT"),

a firefighter, and a paramedic. (Def. St. Mat. Facts ¶ 1.) Defendant Earl Porterfield ("Porterfield") is the former Chief of BEMA; he served as Chief from January 1987 to May 2002. (*Id.* ¶ 2.) Plaintiff was a captain at all relevant times until her demotion in August 1999.[1]

This is the second employment discrimination lawsuit Plaintiff has brought against Porterfield. Plaintiff previously filed suit against Porterfield and BEMA in 1999 asserting claims of racial and gender discrimination under Title VII and 42 U.S.C. §§ 1981 and 1983. (*Id.* ¶ 134; *Bethel v. Porterfield,* CV198–256 (Nov. 8, 1999).)[2] This Court dismissed BEMA and granted summary judgment in favor of Porterfield on all claims in that suit. (*Id.* ¶ 135.) The Eleventh Circuit subsequently affirmed the decision in October 2000. (*Id.* ¶ 136.) The majority of Plaintiff's present allegations arise from events that occurred after *Bethel I,* but like her previous allegations, Plaintiff again claims that she was the victim of discrimination. Defendants contend, however, that any adverse employment actions Plaintiff suffered were a result of her unsatisfactory behavior and work performance, not discrimination.

### A. *Events occurring prior to Bethel I*

Plaintiff was hired by the Burke County EMS in 1984 and in 1987 began working for BEMA as a firefighter/paramedic. (*Id.* ¶ 1.) BEMA requires all full time employees who perform firefighting duties to take and pass a Physical Performance Assessment Test ("PPA") once a year.[3] (*Id.* ¶ 85.) Plaintiff had a history of difficulty with the test[4] and has consistently expressed her opinion that the PPA is not an accurate reflection of fitness for duty. (Pl. St. Mat. Facts ¶ 85.) Plaintiff's experience with the PPA became a focal point of *Bethel I.* However, because the PPA is also at issue in this case, I will briefly recount some facts related to Plaintiff's history with the test.

In March 1998, Plaintiff filed a grievance with Porterfield expressing concerns about the PPA. (Def. St. Mat. Facts ¶ 127.) In response, Porterfield formed a committee to look into the effectiveness of the wellness program and make recommendations regarding the PPA. (*Id.*) Unsatisfied with this response, Plaintiff filed a grievance with the Burke County Board of Commissioners in April 1998.[5] (Def. St. Mat. Facts ¶¶ 128, 130.) Then, in May and June 1998, Plaintiff and three other female employees filed charges with the Equal Employment Opportunity Commission ("EEOC") alleging that elements of the PPA constituted gender discrimination. Plaintiff claims that Porterfield was angered by her complaints and EEOC charge. She further contends that this became one of many factors that motivated the adverse employment actions taken against her at issue in this case. (Pl. St. Mat. Facts ¶ 131.)

As a result of the grievance filed in March, the schedule for administering the PPA was changed. Prior to 1998, fire-

---

**1.** Within BEMA are several ranking positions: chief, assistant chief, battalion chief, senior captain, captain, lieutenant, and private. (Def. St. Mat. Facts ¶ 2.) Plaintiff was promoted from private to lieutenant in 1987 (*id.* ¶ 3), and from lieutenant to captain less than a year later (*id.* ¶ 4).

**2.** I will refer to the first suit as *Bethel I.*

**3.** The Chief, Assistant Chief, Battalion Chiefs, Senior Captains, and employees in training are not required to take the PPA. (*Id.* ¶ 86.)

**4.** Plaintiff had failed the PPA twice in 1996, but eventually passed it on her third attempt. (Def. St. Mat. Facts ¶ 126.)

**5.** The Board of Commissioners denied her grievance in September 1998. (Def. St. Mat. Facts ¶¶ 128, 130.)

fighters were required to take the PPA according to a predetermined schedule. (Def. St. Mat. Facts ¶ 87.) Beginning in September 1998, firefighters were randomly selected to perform the PPA through a computer program.[6] (*Id.* ¶ 88). Plaintiff alleges that not all employees required to take the PPA did so, and that the names of those taking the test were not selected at random. (Pl. St. Mat. Facts ¶¶ 86, 89–90.)

If an employee failed the PPA, they could retake it within the next two weeks. (Def. St. Mat. Facts ¶ 94.) If the employee did not pass the PPA the second time, he or she would be taken off duty, without pay, for a maximum of thirty days. (*Id.*) If the employee did not pass the PPA during the thirty day period, he or she would be placed on unpaid leave for a maximum of six months unless there was a suitable position not requiring active firefighting available. (*Id.*) Defendants claim that to be placed in one of these PPA-exempt positions, the employee had to apply for or notify Porterfield of his or her interest in it. (*Id.* ¶ 95.) Plaintiff, however, alleges that if an employee was on a leave of absence and a position became available, BEMA was obligated to offer the position to that employee. (Pl. St. Mat. Facts ¶¶ 94, 95.)

Plaintiff was selected to take the PPA in September 1998 and failed it.[7] (Def. St. Mat. Facts ¶ 96.) Plaintiff told Battalion Chief Clarence Belger and Porterfield that she did not want to retake the PPA (*id.* ¶¶ 96–97), and she expressed an interest in a position that did not require active fire-fighting (Pl. St. Mat. Facts ¶ 98). Plaintiff contends that Porterfield did not offer to give her the necessary training that would enable her to move to a position exempt from the PPA, but that he had offered similar training to males. (*Id.* ¶ 97.) She also contends that Porterfield knew of positions available at that time but did not tell her about them.[8] (*Id.*) Despite her initial response, Plaintiff retook and passed the PPA a few days later. (Def. St. Mat. Facts ¶ 100.)

Aside from articulating her disdain for the PPA, Plaintiff also has a history of expressing her opinion about other elements of BEMA. One such issue of contention involved a volunteer unit called the Tactical Medical Team ("TMT"), which Porterfield created sometime in 1998. A focal point of *Bethel I*, the TMT was designed to aid "SWAT" teams in neighboring counties. Plaintiff felt that she and other female employees were not considered for placement on the TMT because of their gender. On November 17, 1998 Plaintiff wrote a letter to the editor of a local newspaper opposing the team. (*Id.* ¶ 125.) Afterwards, Plaintiff began to feel that she was being retaliated against for publicly expressing her disdain for the TMT (Pl. St. Mat. Facts ¶ 125); and she filed another complaint with the EEOC in December 1998. She then filed her first suit against Porterfield and BEMA in January 1999.

In April 1999, Assistant Chief Rusty Sanders ("Sanders") sent Porterfield a

---

**6.** The parties dispute exactly how the program operated and how individuals were selected to perform the PPA. (Def. St. Mat. Facts ¶¶ 89–92; Pl. St. Mat. Facts ¶¶ 89–92.) This is discussed more fully, *infra.*

**7.** Defendants claim that Plaintiff was randomly selected using the new computer program, but Plaintiff contends that she was required to take the PPA out of retaliation for filing

EEOC charges. (Pl. St. Mat. Facts ¶¶ 106, 134.)

**8.** Plaintiff's age discrimination claim arises from this allegation as well. (Pl. St. Mat. Facts ¶ 133.) Plaintiff claims that, while she was not transferred to a PPA-exempt position, other BEMA employees, who were younger and had less seniority than Plaintiff, were promoted to such positions. (*Id.*)

memorandum notifying him of problems Sanders was allegedly experiencing with Plaintiff and recommending that Plaintiff be terminated. (Def. St. Mat. Facts 63, 69.) According to Sanders, Plaintiff accused Lieutenant Dave Willard and Lieutenant Jim White of being involved in a "conspiracy" against her and had "began a defamation . . . campaign" against Willard and White that included making derogatory comments about them to others at the station and issuing improper written warnings. (*Id.* ¶¶ 64–66, 71.) Plaintiff contends that the alleged conspiracy against her was retaliation for filing her discrimination suit and she denies that the alleged incidents reported in Sanders' memorandum occurred. (Pl. St. Mat. Facts ¶¶ 63–67.) The unrest at the station, primarily between Plaintiff and Willard, continued into July 1999; and each issued the other several written warnings during this time. (Def. St. Mat. Facts ¶¶ 72–80.) Although Plaintiff contends that all of her warnings were legitimate and necessary (Pl. St. Mat. Facts ¶¶ 69–80), she acknowledges that she and Willard were engaged in a "nitpicking little war back and forth" (*id.* ¶ 81). Porterfield concluded that the warnings were a result of a petty personality conflict (Def. St. Mat. Facts ¶ 82), and as a result, did not place the warnings in Plaintiff's or Willard's personnel files and did not consider them when deciding whether Plaintiff or Willard would receive a merit pay increase that became available in late 1999. (*Id.*)

### B. *Events occurring after Bethel I*

In July 1999, during discovery and depositions for *Bethel I*, Porterfield learned that Plaintiff allegedly allowed the consumption of alcohol at her station more than once in 1998.[9] (*Id.* ¶¶ 8–25.) BEMA prohibits the use and consumption of alcohol on BEMA and Burke County premises (*id.* ¶ 5), and it is BEMA policy that a supervisor's failure to enforce BEMA rules will result in disciplinary action (*id.* ¶¶ 5, 6). Although she admits that others consumed alcohol on BEMA premises while in her presence, Plaintiff disputes the factual recollections of Campbell and denies that she *allowed* alcohol to be consumed on BEMA premises. (Pl. St. Mat. Facts ¶¶ 8–25.)

Through interviews and an investigation, Porterfield attempted to ascertain the accuracy of Campbell's statements and concluded that they were correct. (Def. St. Mat. Facts ¶ 26.) He instructed Plaintiff to meet with him on August 16, 1999 to discuss the allegations and present her version of what happened. (*Id.* ¶ 27.) Plaintiff's former attorney advised her not to discuss any deposition testimony and to reschedule the meeting so that he could attend. (*Id.* ¶ 28.) Plaintiff sent Porterfield a letter to this effect on August 14 and did not come to work on August 16. (*Id.* ¶¶ 29–30.) Porterfield sent Plaintiff a letter on the 17th instructing her to meet with him on August 24. (*Id.* ¶ 31.) In that letter, he informed Plaintiff that because the meeting was an inter-departmental hearing, she did not have a right to have an attorney present, and that due to her refusal to attend the August 16 meeting, she was suspended from her position as captain pending the outcome of the August 24 hearing.[10] (*Id.* ¶ 31.) Plaintiff's attorney then advised her to attend the August 24 meeting but to "take the fifth" with re-

---

9. Janis Campbell, also a BEMA employee and a plaintiff in *Bethel I*, had documented the alleged incidents in her diary in October 1998. (Def. St. Mat. Facts ¶¶ 8–9.)

10. Plaintiff asserts that she was not aware, at the time she postponed the meeting, that the meeting was actually a hearing and that she did not have a right to reschedule to accommodate her attorney. (Pl. St. Mat. Facts ¶ 31.)

spect to any questions about the consumption of alcohol on BEMA premises. (Def. St. Mat. Facts ¶ 32.) Relying on this advice, Plaintiff met with Porterfield and Belger but refused to discuss Campbell's allegations. (*Id.* ¶ 34.) At the hearing, Porterfield explained that the meeting was not a criminal proceeding and that Plaintiff had the opportunity to present any contrary evidence about the incidents in question. (*Id.* ¶ 34.) Plaintiff, however, believed that the decision to demote her had already been made and that, based on her own deposition testimony, Porterfield knew that she disputed the allegations. (Pl. St. Mat. Facts ¶ 35.) She therefore refused to discuss any of Campbell's deposition testimony.

Based on deposition testimony from *Bethel I,* his own inquiries, and Plaintiff's refusal to offer any contrary evidence at the inter-departmental hearing held on August 24, Porterfield demoted Plaintiff to private in August 1999.[11] (Def. St. Mat. Facts ¶¶ 36–44.)

Plaintiff felt that Porterfield's investigation was selective, that other parties involved in the incidents, including Campbell and those who consumed the alcohol on BEMA premises, should have been disciplined as well, and that she was demoted because she is a woman and in retaliation for bringing the previous suit. (Pl. St. Mat. Facts ¶¶ 40–44.) Plaintiff filed a grievance with the Burke County Board of Commissioners expressing these concerns and attended a hearing before the Commissioners on this issue in September 1999. (Def. St. Mat. Facts ¶ 45.) She also filed another complaint with the EEOC in September 1999. The Commissioners denied Plaintiff's grievance (*id.* ¶ 46), and Plaintiff maintains their actions were also the result of a retaliatory motive (Pl. St. Mat. Facts ¶ 47). Defendants contend that the demotion was fair, it was not

retaliatory, and that other male employees were similarly demoted for comparable infractions. (Def. St. Mat. Facts ¶¶ 48–49.)

In December 1999, the Commissioners authorized merit pay increases for county employees. (Def. St. Mat. Facts ¶ 50.) Porterfield was informed of the Commissioners' decision and given three days to determine which employees would receive the merit pay increase. (*Id.* ¶ 52.) Employees who had been demoted, employed with BEMA for six months or less, or who had received three or more written warnings received no increase; employees with two written warnings received a one percent increase; and employees with one or no written warnings received a two percent increase. (*Id.* ¶¶ 53–58.) Due to her demotion, Plaintiff did not receive any merit pay increase. (*Id.* ¶ 55.) Plaintiff contends that the criteria for awarding pay increases was not followed and the method used was unlawful. (Pl. St. Mat. Facts ¶ 51.) She also claims that her denial of a merit pay increase was unauthorized because it was based on her unlawful demotion. (*Id.* ¶ 53.)

Plaintiff filed another charge with the EEOC in March 2000, and she filed a grievance with the Commissioners concerning the decision to deny her a pay increase. (Def. St. Mat. Facts ¶ 61.) A hearing before the Commissioners was held on May 4, 2000. (*Id.*) Without explanation, the grievance was subsequently denied by the Commissioners. (*Id.*; Pl. St. Mat. Facts ¶ 61.)

In August 2000, Plaintiff scheduled an elective hysterectomy to be performed in December of that year. (Pl. St. Mat. Facts ¶ 102.) She did not feel that her medical condition inhibited her ability to perform her job duties or take the PPA (*id.* 103; Pl. St. Mat. Facts ¶¶ 102–03);

11. *See* footnote 2 *supra.*

and she did not provide any documentation from her physician stating that she had a medical condition. (Def. St. Mat. Facts ¶ 107.) Plaintiff asserts, however, that the doctor who performed her yearly physical examinations for BEMA was aware of her health problems (Pl. St. Mat. Facts ¶ 107) and that she told her immediate supervisor, Ricky Ross, about the scheduled surgery. (*Id.*) She contends Ross relayed the message to other supervisors (*id.*), but Defendants deny any other supervisor knew about her upcoming surgery. (Def. St. Mat. Facts ¶¶ 105–07.)

As of November 2000, Plaintiff had not yet taken the annually administered PPA. (Pl. St. Mat. Facts ¶¶ 86, 101). Plaintiff was selected to take the PPA on November 8, 2000. (*Id.* ¶ 108.) She attempted to take the test, but was unable to complete it and was taken to the emergency room where she was treated for dehydration and released a couple of hours later. (*Id.* ¶¶ 109–10.) Although she had had nothing to drink prior to taking the test besides a cup of coffee (*id.* ¶ 108), Plaintiff alleges that she was dehydrated because of her medical condition and that a hostile environment affected her ability to pass the test. (Pl. St. Mat. Facts ¶ 108.) She also contends that, contrary to Defendants' claims that all employees who were required to take the PPA in 2000 did so, only thirty-three of the ninety-six employees required to take it, did. (*Id.* ¶¶ 111–12; Def. St. Mat. Facts ¶ 112.)

After failing the PPA, Plaintiff was told that she had until November 25, 2000 to retake the test, and that if she did not pass the PPA within the two week period, she would be placed off duty. (Def. St. Mat. Facts ¶¶ 114–15.) She told Ross that she did not feel up to retaking the test. (*Id.* ¶¶ 115–16.) Plaintiff was taken off duty beginning on November 27, 2000, and on November 25, left BEMA premises, not to return. (*Id.* ¶¶ 116–17.) Plaintiff alleges

that males who had physical ailments were transferred to PPA-exempt positions until they were able to return to their former positions, and that although there was a PPA-exempt position available, it was not offered to her. (Pl. St. Mat. Facts ¶ 116.) She further alleges that she did not leave voluntarily on November 25, but was told to leave by Ross. (*Id.* ¶ 117.)

Plaintiff did not contact BEMA nor Porterfield any time after November 27, 2000 and did not make any inquiries regarding available non-firefighting positions. (Def. St. Mat. Facts ¶¶ 119–20.) Plaintiff asserts that it was not her duty to inquire about such positions and that she did not believe any positions would be offered to her. (Pl. St. Mat. Facts ¶¶ 119–20.) On January 8, 2001 Plaintiff applied for a full time position with Jenkins County EMS as a paramedic. (Def. St. Mat. Facts ¶ 112.) She began working part time for Jenkins County EMS in February 2001 and began full time work in May 2001. (*Id.* ¶ 123.) Pursuant to BEMA policy, Plaintiff received vacation pay until December 10, 2000 and remained on leave without pay until May 8, 2001. (*Id.* 124.) Plaintiff contends that she was not given any notice that she was on leave without pay and did not realize that she was still a BEMA employee when she applied for the job with Jenkins County EMS. (Pl. St. Mat. Facts ¶ 124.)

As a result of the foregoing events, Plaintiff filed suit on January 14, 2002 alleging gender and age discrimination, retaliation, and violations of her constitutional rights to due process and equal protection.

## II. REQUIREMENTS FOR SUMMARY JUDGMENT

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor. . . ." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the nonmoving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is

entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark,* 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick,* 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the non-moving party notice (Doc. No. 33) of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ready for consideration.

## III. *ANALYSIS*

### A. Plaintiff's §§ 1983 and 1988 Claims and Substitution of Porterfield

 Plaintiff is suing Porterfield in his individual and official capacity. (Am. Compl.¶ 9.) Porterfield, however, is no longer Chief of BEMA (Porterfield Aff. ¶ 2), and therefore cannot be sued in his official capacity. He was replaced by Sanders in 2002, after this suit was filed. *Id.* When a public officer is a party to an action in an official capacity, and during its pendency ceases to hold office, the officer's successor is automatically substituted as a party. Fed.R.Civ.P. 25(d)(1). Under this rule, proceedings against an individual, in his official capacity, following the substitution will be in the name of the substituted party. *Id.* This rule does not provide substitution, however, where the defendant is also being sued personally. *Ellison v. Chilton County Bd. of Educ.,* 894 F.Supp. 415, 417 n. 3 (M.D.Ala.1995). In such case, the claims for individual liability continue unaffected. *Id.*

Plaintiff is suing Porterfield individually for violations of Title VII and 42 U.S.C.

§§ 1983 and 1988. However, Porterfield cannot be liable under Title VII in his individual capacity. *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991). Additionally, because Plaintiff has failed to provide any legal or factual support for the alleged violations of 42 U.S.C. §§ 1983 and 1988 [12] in her opposition to Defendants' motion for summary judgment, she has apparently abandoned these claims.[13] Therefore, summary judgment is **GRANTED** on Plaintiff's claims under 42 U.S.C. §§ 1983 and 1988 against all Defendants, and Porterfield is **DISMISSED.** Plaintiff's Title VII claims will continue unaffected against Sanders, in his official capacity, and Burke County.

### B. Title VII Claims

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Although Title VII proscribes certain discriminatory actions taken against employees, it "is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *Davis v. Town of Lake Park,* 245 F.3d 1232, 1239 (11th Cir.2001) (internal quotation marks omitted) (citation omitted). Moreover, Title VII was not enacted to make federal courts "sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991).

---

**12.** These claims include sexual discrimination, a First Amendment violation, a Fourteenth Amendment violation, due process violations, and equal protection violations. (*See* Am. Compl.)

**13.** In the 61 pages of memoranda that Plaintiff's counsel has filed in opposition to the

motion for summary judgment, § 1983 is only briefly mentioned and § 1988 is not mentioned at all. (*See* Pl. Brief in Response at 16, 43.) *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995) (en banc) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

Plaintiff has alleged that Defendants discriminated against her because of her sex and in retaliation by (1) demoting her; (2) not giving her a merit pay increase; and (3) requiring her to take the PPA. Under Title VII, an employer may be liable for unlawful sex discrimination under any one of three discrete theories: disparate treatment discrimination, pattern and practice discrimination, or disparate impact discrimination. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000). Both disparate treatment and pattern and practice claims require proof of discriminatory intent; disparate impact claims do not. *Id.* Plaintiff appears to allege discrimination under all three theories.

### 1. Disparate Treatment

█ In a disparate treatment case, the plaintiff bears the ultimate burden of proving that the employment action at issue was taken because of the plaintiff's gender. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d at 1274 (citations omitted). This may be established by presenting statistics, *Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985), by presenting direct evidence of discrimination, or by relying on circumstantial evidence, *Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir. 1999). Two decisions of the Supreme Court control the analysis of disparate treatment claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the framework for analysis when a plaintiff presents a prima facie case of discrimination and is confronted with the employer's assertion of a non-discriminatory reason for an employment decision. The employee may then attempt to show the proffered reason is false or pretextual. The *Price Waterhouse*,[14] or commonly called mixed-motive, analysis applies when the evidence shows a

mixture of proper and improper motives. Where the *McDonnell Douglas* prima facie case analysis only requires that a plaintiff generate a bare inference of discrimination, *Price Waterhouse* requires probative evidence of motive. *Brown v. Walt Disney World Co.*, 805 F.Supp. 1554, 1561 (M.D.Fl.1992).

The *McDonnell Douglas* formula encompasses both a prima facie case and a burden-shifting scheme. This method of proof seeks to narrow a plaintiff's case to its most basic elements. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff must first establish a prima facie case of disparate treatment by showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she and a similarly situated non-protected person received dissimilar treatment; and (4) she was qualified to do the job. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). If the plaintiff establishes a prima facie case, a feather-weight burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action in question. *Holifield*, 115 F.3d at 1564. If the defendant carries its burden, the plaintiff retains the burden of persuasion to show that the employer's proffered explanation was not the real reason for the employment change, but was instead a pretext for discrimination. *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256, 101 S.Ct. 1089. It is important to note, however, that while the presumption of discrimination "drops out of the picture" after the defendant has articulated a nondiscriminatory reason for the action, the trier of fact may still consider the plaintiff's prima facie evidence and any inferences that can be properly

---

**14.** *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

drawn from that evidence to show pretext. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). That is, a plaintiff need not provide further evidence but may develop an inferential case from the evidence already in the record.

Under the *Price Waterhouse* formula, a plaintiff must prove by a preponderance of the evidence that an illegitimate factor played a motivating role in the employment decision. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2154, 156 L.Ed.2d 84 (2003). This can be done through direct or circumstantial evidence. *Id.* Once an unlawful motive has been established, a defendant may avoid damages or liability altogether if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias.[15] 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B). Although Plaintiff herein does not clearly articulate whether she is seeking relief under a pretext or mixed-motive claim, out of caution I will address both.

### a. Demotion

■■■ Plaintiff claims that she was demoted unlawfully and relies on circumstantial evidence to establish a prima facie case of gender discrimination. The parties do not dispute that Plaintiff is a member of a protected class, was qualified for the job, and suffered an adverse employment action. They disagree, however, as to whether Plaintiff was treated less favorably than similarly situated male employees. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.1998). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.*

In evaluating whether Plaintiff has identified a similarly situated employee, Defendants maintain that the comparator's misconduct must be "nearly identical" to Plaintiff's so that courts will not second-guess employers' reasonable decisions and "confuse apples with oranges." *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir.2001) (citations omitted); *Maniccia v. Brown,* 171 F.3d 1364, 1368– 69 (11th Cir.1999); *Williams v. Motorola Inc.,* 303 F.3d 1284, 1293 (11th Cir.2002); *Nowlin v. Jones Intercable, Inc.,* 102 F.Supp.2d 1364, 1370 (S.D.Ga.2000). Plaintiff, however, asserts that the individual does not have to be one who has "engaged in the same or nearly identical conduct" as the disciplined plaintiff, but merely a *similar* comparator who has participated in *similar* misconduct. *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1333–34 (11th Cir.2000). Alternatively, she contends that the comparable conduct need not be nearly identical in form, but only nearly identical in severity. *Lobeck v. City of Riviera Beach,* 976 F.Supp. 1460, 1466 (S.D.Fl.1997). The Eleventh Circuit has yet to articulate a definitive standard for analyzing comparable employees and their misconduct. *See Maynard v. Bd. of Regents of Div. of Univs. of Fl. Dep't of Educ. ex rel. Univ. of S. Fl.,* 342 F.3d 1281, 1290 (11th Cir.2003) ("Regardless of whether this analysis required

---

**15.** While evidence that the defendant would have made the same employment decision even in the absence of the discriminatory motive is an affirmative defense in retaliation, ADEA, and §§ 1981 and 1983 cases, the 1991 amendment to Title VII provides that it is only a limit to damages in discrimination cases. *See Mabra v. United Food & Commercial Workers Local Union No.1996,* 176 F.3d 1357, 1358 (11th Cir.1999).

'similar' misconduct ... or the seemingly more stringent 'nearly identical' misconduct ... neither standard is satisfied here."); *Knight v. Baptist Hosp. of Miami, Inc.,* 330 F.3d 1313, 1316 n. 3 (11th Cir.2003) ("While the district court did say that Arnold's record was not 'nearly identical' to [Plaintiff's], we do not believe that the district court thought 'identical' was the key or that the district court applied the wrong standard.").

■ Based on a review of the cases, I disagree with Plaintiff's implication that the misconduct need only be nearly identical in severity, but not nearly so similar in form. Further, I conclude that, while an exact correlation is unnecessary, the offenses and punishments must be "fair congeners" so that apples are compared to apples. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (plaintiff and employees must be "similarly situated in all relevant respects"). Plaintiff has failed to meet the burden of showing adequate similarities between her conduct and that of a male employee. *Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989) ("the burden is on [the plaintiff] to show a similarity between his conduct and that of white employees").

Plaintiff cites three incidents as support for her assertion that she was treated less favorably than similarly situated male employees. The first involves the same conduct that resulted in Plaintiff's demotion, allowing the consumption of alcohol on BEMA premises. Plaintiff alleges that Bill and Virginia Kitchens had consumed alcohol at other stations, specifically at the station where Porterfield and Sanders were in charge, but that no other supervisors were demoted.[16] Mr. and Mrs. Kitchens, however, testified that they had not consumed alcohol at any station other than Plaintiff's. (V. Kitchens Dep. at 9–10; B. Kitchens Dep. at 7.) Further, Sanders stated that he had never observed Mr. or Mrs. Kitchens consume alcohol on BEMA premises. (Sanders Aff. ¶ 3.) Plaintiff counters with evidence that Mr. and Mrs. Kitchens filled their ice chest at headquarters, that Sanders was seen talking to them while they were drinking from cups, and that they must have been "drinking alcoholic beverages or something clandestine [in the presence of Sanders] because of the way they were secluded or separated themselves." (Bunn Dec. ¶ 5–7; Rainge Dec. ¶ 38–44.) Getting ice from the station cooler, visiting with Sanders, and drinking beverages from cups does not violate BEMA rules. Also, although she suspects alcoholic beverages were being consumed, Plaintiff has no knowledge of what the Kitchenses were actually drinking. (Bunn Dec. ¶ 7; Rainge Dec. ¶ 43.) Finally, and most importantly, Plaintiff has presented no evidence that Porterfield knew of the alleged consumption of alcohol at other stations. If Porterfield was not aware of the events, they cannot be considered in determining whether employees are similarly situated. *Knight,* 330 F.3d at 1317 n. 5.

Second, Plaintiff maintains that she was not treated similarly to Ken Chance. Chance allegedly failed to report for work on one occasion because he was intoxicated, but he was not disciplined. (Pl. Br. in Resp. to Def. Mot. for Summ. J. at 21.) Porterfield admittedly was not aware of the incident until Plaintiff's deposition in

---

**16.** Plaintiff also states that Virginia Kitchens, who was not disciplined, should be considered a comparator for purposes of analyzing whether a similarly situated employee outside the protected class was treated more favorably than Plaintiff because Mrs. Kitchens is "considered like one of the guys." Regardless of how Mrs. Kitchens is considered, she is nonetheless a woman and within the protected class. Also, she was off duty at the time of the alleged incident, and not a supervisor. Thus, she is not a similarly situated employee.

February 2003, and Plaintiff claims he did not take action to discipline Chance at that time. However, Chance's employment with BEMA ended in 1994 (Def. Reply Br., Ex. B). Thus, it would have been impossible for Porterfield to discipline Chance after he learned of the incident during Plaintiff's deposition.

Third, Plaintiff relies on an incident involving several male employees who were disciplined for horseplay when one private attempted to spray another with pepper spray. Plaintiff claims this incident is similar in form and seriousness [17] to the misconduct she was demoted for, but that the male employee in charge, Clarence Belger, was not similarly disciplined. Belger was placed on six months probation and was not demoted. Contrary to Plaintiff's assertions, however, Belger was not placed on probation for failing to supervise, as Plaintiff was, but for being untruthful with Porterfield about the incident. (Pl. Br. at 22; Pl.Ex. T.) Also, whereas Plaintiff never reported the consumption of alcohol at her station, Belger did report the pepper spray incident and disciplined the employees involved. (Porterfield Dep., Ex. 6.) Porterfield placed Belger on probation based on his conclusion that Belger had learned of the incident sooner than he had previously indicated.[18] (Pl.Ex. T.) Fur-

ther, Belger emphatically denied that he was aware of the pepper spray incident at the time it occurred, while Plaintiff admitted that she was aware of alcohol consumption on BEMA property. (Belger Dep. at 22–23; Bethel Dep. at 81–82.)

Aside from the differences between Plaintiff's and Belger's conduct, there are also differences between their positions with BEMA. Plaintiff was a captain at the time of the alleged misconduct. Belger was a Battalion Chief. Although both had supervisory duties, Defendants maintain that Belger had substantially different duties and responsibilities than Plaintiff. (Jordan Dep. at 8; Belger Aff. ¶ 3–7.) Except for stating that both positions had a duty to report misconduct (Pl. Sur–Reply Br. at 7), Plaintiff has failed to provide any evidence that these positions are similar. Further, if these two positions were comparable in their duties to report misconduct, Plaintiff failed in her duties while Belger complied with his. Belger not only reported the incident to his superiors, but also disciplined the employees involved. (Porterfield Dep., Ex. 6.) Plaintiff, on the other hand, did not even report the incident to anyone and did not ask them to leave the station.[19] (Bethel Dep. at 83.)

---

**17.** Based on what she learned from a third party, Plaintiff asserts that the pepper spray incident was even more serious than her misconduct because employees were injured while on duty and the private who was sprayed had to go to the emergency room. (Pl. Br. at 21.) However, there is no evidence that anyone was injured nor went to the emergency room as a result of the incident; in fact, the evidence is to the contrary. (Belger Dep. at 20–21; Porterfield Dep., Ex. 6.)

**18.** The memorandum in which Porterfield explained the reasons for Belger's probation includes the following:

> When the problem occurred at headquarters with the pepper spray you advised me

that you were not aware of it at the time. You indicated that the staff and specifically the officers at headquarters had hidden the facts from you. I have been advised that you were in dispatch the entire time.... This again indicates that I cannot trust you....

(Pl.Ex. T.)

**19.** Plaintiff did tell Mr. Kitchens that she "did not need this" and they would get her in trouble, but she did not ask them to leave because she did not want to be rude. (Bethel Dep. at 69, 83.) Although she did not believe that she would be able to get the couple to leave, she did not call her duty chief nor anyone from the station house to assist her. (*Id.* at 74–75.)

Finally, the pepper spray incident was a one time occurrence, whereas Plaintiff allegedly allowed the consumption of alcohol on BEMA premises on multiple occasions. Although Plaintiff claims there is no evidence that she allowed drinking on more than one occasion (Pl. Br. at 20), there is deposition testimony from *Bethel I* that alcohol was consumed at her station multiple times (Bethel Dep., Ex. 7). Plaintiff contends that Campbell's journal entries were inaccurate, but she provides no evidence to refute their contents. (Bethel Dep. at 100–01.) Also, when given the opportunity to contest Campbell's recollections and explain her own version of the incidents at the inter-departmental hearing with Porterfield, Plaintiff remained silent.[20] (Bethel Dep., Ex. 14.) Thus, it was reasonable for Porterfield to believe that Plaintiff allowed alcohol consumption on BEMA premises more than once. Employees who engaged in several instances of misconduct are not similarly situated to an employee who engaged in misconduct on only one occasion. *See Silvera*, 244 F.3d at 1259; *Maniccia v. Brown*, 171 F.3d at 1369. Plaintiff has failed to meet her burden of showing the Court that she and Belger were adequately similar in order to establish a prima facie case of discrimination regarding her demotion.

■ Even assuming that Plaintiff could establish a prima facie case, Defendants have proffered a legitimate, nondiscriminatory reason for Plaintiff's demotion which Plaintiff has failed to sufficiently rebut. It is undisputed that BEMA policy prohibits the consumption of alcohol on BEMA premises, that Plaintiff received and understood this written policy, and that Plaintiff understood that a supervisor's failure to enforce BEMA's rules would be considered a failure to supervise and would result in disciplinary action. (Bethel Dep. at 63–67.) Plaintiff saw alcohol being consumed on BEMA premises, and although she expressed displeasure with the activity and the position it put her in, she did not ask those drinking to leave, did not call for assistance, and did not report the incident afterwards. (*Id.* at 80–83.) This incident is a legitimate reason for Plaintiff's demotion.

In an effort to defeat summary judgment, Plaintiff attempts to establish that Defendants' reason is unworthy of credence and that they were motivated by a discriminatory reason in taking their actions against her. *See Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Under the *McDonnell Douglas* analysis, Plaintiff must show that a discriminatory reason more likely than not motivated Porterfield's decision to demote her. *Id.* Under a mixed-motive analysis, Plaintiff need only show that discrimination was *a* motivating factor. *Desert Palace, Inc.*, 123 S.Ct. at 2154.

In support of her assertion of pretext and an unlawful motive, Plaintiff first claims that she did not allow alcohol consumption on BEMA premises on *multiple* occasions. As discussed above, she has not, however, refuted the evidence that drinking occurred at the station under her watch at least once and that Porterfield had reason to believe deposition testimony that it occurred other times. The inquiry into pretext centers upon the employer's beliefs, not the employee's own perceptions of her performance. *Holifield*, 115 F.3d at 1565. Defendants need only to show that Porterfield had good reason to believe Plaintiff committed the violation. *Jones*, 874 F.2d at 1540 (citations omitted).

---

**20.** Plaintiff did not answer Porterfield's questions at the disciplinary hearing because she was advised not to by her attorney. (Bethel Dep., Ex. 14.) While I am sympathetic to her reasons, Plaintiff's decision to remain silent does not help her refute the evidence that she allowed alcohol consumption on BEMA premises more than once.

Defendants have done so based upon Campbell's diary entries, and her deposition testimony, and Plaintiff's deposition testimony from *Bethel I.* (Porterfield Aff. ¶ 4–7.)

Plaintiff also claims that when presented with Campbell's report of alcohol consumption on BEMA premises, Porterfield failed to investigate the incident as "a fair-minded public official" because he did not inquire about whether alcohol had been consumed in the presence of other supervisors. Although Porterfield never asked Mrs. Kitchens if she had consumed alcohol at other stations, the purpose of the meeting with Mrs. Kitchens was to ascertain the accuracy of the statements made by Campbell during her deposition. (Porterfield Dep. at 125.) There is no evidence that he intentionally "buried his head in the sand" regarding other supervisors' alleged misconduct. (Pl. Br. at 9.) Failing to broaden the scope of the meeting with Mrs. Kitchens is insufficient to establish that Porterfield had an unlawful motive in demoting Plaintiff.

Plaintiff also asserts that Porterfield did not act in good faith when he suspended her for her failure to attend the interdepartmental hearing. After her refusal to meet with Porterfield to discuss Campbell's allegations, Plaintiff was suspended from her duties as captain (although she retained her rank) pending the outcome of another meeting scheduled the next week. Plaintiff claims that this suspension is evidence of discrimination, and that because she was relying on advice from an attorney, any adverse action that resulted from her refusal to attend the meeting is pretextual. However, the adverse action Plaintiff relies on for her discrimination claim is her demotion, not the one-week suspension. She has not presented any evidence that she was *suspended* unlawfully. Plaintiff was demoted because of Porterfield's belief that she allowed the consumption of alcohol on BEMA premises, not because she refused to meet with him. Furthermore, Plaintiff does not dispute the fact that a BEMA employee could be terminated for insubordination, but contends that "it was an overreaction to conclude [she] refused to come to the meeting." (Pl. Br. at 26.) Plaintiff's letter clearly stated that "I will not meet with you ... without my lawyer present. You will have to set up a date we can both agree on." (Bethel Dep., Ex. 12.) While Plaintiff contends that her letter was merely a request to reschedule, it is reasonable that under the circumstances Porterfield could interpret it as an insubordinate refusal to meet with him.

Finally, Plaintiff contends that there is evidence that Porterfield shifted his reasons for the demotion, pointing to the memorandum written by Sanders. The Sanders' memorandum contained numerous alleged incidents of misconduct by Plaintiff, and she goes to great lengths to explain that the circumstances surrounding the memorandum provide evidence of pretext.[21] Plaintiff contends that Porterfield directed Sanders to create the memorandum as a justification for adverse action against her (Pl. Sur–Reply Br. at 9–11), although Sanders testified that he created it of his own accord (Sanders Dep. at 19–20). According to Plaintiff, when Porterfield learned of Plaintiff's misconduct concerning alcohol consumption on BEMA premises, the memorandum was hidden because it was no longer needed to justify an employment change. Plaintiff states: "*If* Defendants intend to offer these as

---

21. According to Plaintiff, "Porterfield authorized Chief Sanders to aid Willard, in insubordination to Captain Bethel, and help draft the thirteen-page, single-spaced memo ... as the other ammunition that Porterfield was developing to use against Bethel...." (Pl. Br. at 25.)

reasons for Plaintiff's treatment at BEMA, the incidents constitute shifting reasons." (emphasis added) (Pl. Br. at 28.) However, Porterfield testified that this memorandum did not result in any adverse employment action against Plaintiff, and there is no evidence that it influenced his decision to demote her. (Porterfield Dep. at 78.) Contrary to Plaintiff's allegations, there is no evidence that Porterfield and/or Sanders created the memorandum as pretext for discrimination, and the memorandum itself does not provide evidence that Plaintiff's violation of BEMA alcohol policy was used as a pretext either.

Plaintiff has failed to establish a prima facie case and has failed to show that Defendants' proffered reason for her demotion is pretext for gender discrimination. Further, she has not established that gender discrimination was a motivating factor in Porterfield's decision to demote her, and therefore, has not shown that this is a mixed-motive case.

### b. Merit Pay Increase

■ Plaintiff contends that she did not receive a merit pay increase because of discrimination. The undisputed evidence demonstrates that Plaintiff did not receive a merit pay increase in January 2000 because of her demotion in August 1999. (Bethel Dep. at 295; Porterfield Aff. ¶ 14.) Plaintiff admits that any employee who had been legitimately demoted in 1999 was not entitled to a merit pay increase but asserts that she was unlawfully demoted, and therefore, the denial of a merit pay increase was unlawful as well.

For the same reasons that her demotion does not constitute disparate treatment, the denial of the merit pay increase does not support a discrimination claim. Plaintiff has failed to identify any male employee who was demoted, yet still received a merit pay increase. (Porterfield Aff. ¶ 14.) In fact, Plaintiff has failed to offer any support for her allegations that the denial of a merit pay increase was a result of gender discrimination. Several males were denied a merit pay increase (Bethel Dep., Ex. 9; Bethel Dep. at 291–92) and several females received a merit pay increase (Bethel Dep. at 178–181, 291; Bethel Dep., Ex. 17). Although Plaintiff names several women who did not receive the increase, she admittedly does not know why their merit pay increases were denied. (Bethel Dep. at 178–79). The Court has spent considerable time reviewing Plaintiff's briefs and finds only conclusory statements unsupported by evidence. (See Pl. Br. in Resp. to Mot. Summ. J. at 28.) These empty assertions are insufficient to sustain a claim of discrimination based on a denial of the merit pay increase.

### c. PPA

Plaintiff also alleges gender discrimination because she was required to take the PPA. Although not entirely clear, it appears that Plaintiff relies on the PPA as a basis for a pattern and practice or disparate impact claim. As such, her claims regarding the PPA are addressed below.

### 2. Pattern and Practice

■ A pattern and practice claim is another way for a plaintiff to establish disparate treatment. See Hall v. Alabama Ass'n of Sch. Bds., 326 F.3d 1157, 1171–72 (11th Cir.2003). In the typical pattern and practice case, the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the standard operating procedure. Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 335–36, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (citations omitted). To meet this burden, a plaintiff must "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." Id. at 336, 97 S.Ct. 1843. While proof of a discriminatory motive is

critical, sufficiently compelling statistical evidence is often used to establish the existence of a pattern or practice. *Joe's Stone Crab, Inc.,* 220 F.3d at 1287; *Eastland v. Tennessee Valley Auth.,* 704 F.2d 613, 618 (11th Cir.1983). Once a pattern or practice is established, the burden of proof then shifts to the employer to demonstrate that the plaintiff's showing is either inaccurate or insignificant. *Joe's Stone Crab, Inc.,* 220 F.3d at 1287 n. 12.

Plaintiff relies on her demotion and the PPA as evidence that BEMA has created a "glass ceiling" through its pattern of denying women opportunities and giving breaks to men through manipulation of subjective decisions.[22] A "glass ceiling" is the use of a policy or practice to exclude members of a protected class from upper levels of the workforce. *See Cooper v. Southern Co.,* 205 F.R.D. 596 (N.D.Ga.2001). Like other pattern and practice claims, these cases are treated as disparate treatment cases under Title VII. *Andrade v. Morse Operations,* 946 F.Supp. 979, 982 (M.D.Fl.1996). Plaintiff claims BEMA has an upper echelon of male employees who are exempt from the PPA and can stay with BEMA until they retire, but that women were deliberately kept out of these PPA exempt positions. (Pl. Br. at 2–3.) Instead of specifically alleging that Porterfield failed to promote women, as she did in *Bethel I,* Plaintiff now claims women were demoted or terminated before they had the chance to obtain such positions.

Plaintiff contends that a pattern and practice of discrimination is evidenced by three sets of "compelling statistics." First, according to Plaintiff, between 1987 and 1995, there were twenty-six women working as EMTs or firefighters (Bethel

Aff. ¶ 281), but when Porterfield initiated the "dummy drag" as part of the PPA, that number dwindled so that there are currently only three female EMT/firefighters (*id.* ¶ 284). Second, Plaintiff relies on the fact that no woman has ever held a position above the rank of senior captain, and that the highest rank a female employee currently holds is that of private. (Jordan Dep. at 11–12.) Third, Plaintiff alleges that although Defendants maintain everyone was required to take the PPA once a year, only nine out of ninety-seven employees took the PPA in 1999; only thirty-three out of ninety-six took the PPA in 2000; only new employees took the PPA in 2001; and only seventy out of 104 employees took the PPA in 2002. (Pl. Br. at 34.)

■ Construing the evidence in the light most favorable to Plaintiff, these statistics *may* be sufficient to show a prima facie case of a pattern and practice of discrimination. However, Defendants have successfully demonstrated that these statistics are inaccurate and that discrimination is not the standard operating procedure at BEMA. Although the number of female employees at BEMA has decreased since 1987, there is no evidence that the decline is a result of discrimination or the PPA requirement. Only two females were ever terminated for inability to pass the PPA (Def.Ex.21–23) and numerous females have left BEMA voluntarily (Jordan Dep. at 12; Bethel Dep. at 12, 16, 18; Rainge Aff. ¶¶ 19, 23). Further, there are currently four female EMT/firefighters and others in training. (Jordan Dep. at 11.) As for the rank of female employees at BEMA, women have held the positions of lieutenant, captain, and senior captain

---

22. Plaintiff also claims that this pattern of discrimination is evidenced by a failure to promote women to PPA-exempt positions. However, Plaintiff's complaint did not allege a failure to promote claim and summary judg-

ment was granted on this issue in *Bethel I.* Therefore, this claim is barred by res judicata and will not be addressed a second time. (*See* Order of November 8, 1999 at 15–16.)

(Porterfield Supp. Aff. ¶¶ 3–5), and there is no evidence that a female has ever applied for a higher ranking position, such as battalion chief (*id.* ¶ 5).

Although Plaintiff believes that the PPA is unfairly administered, the statistics that she provides are insufficient to show that women were selected to take the test while men were not, and there is no evidence that the PPA was used as a means to prohibit women from advancing within the ranks of BEMA. Furthermore, there is evidence that Plaintiff's statistics are inaccurate. Both parties have submitted a list of BEMA employees from 2000 (Pl.Ex. O; Def. Rep. Br., Ex. D) and proceed to classify those employees on the basis of full time employment, firefighting duties, resignations during the year, and being required to take the PPA. (Bethel Ex. N; Def. Rep. Br., Ex. E, G.) In Plaintiff's attempt to show not everyone required to take the PPA did so, and Defendants' attempt to show that those who did not take the PPA were either not full time firefighters or resigned, both parties have added and omitted names from the supposedly exhaustive list of BEMA employees in 2000. Therefore, it is nearly impossible for the Court to determine who was required to take the PPA, who was exempt from the test, and who merely did not take it for one reason or another.[23] The only clear evidence that arises from these documents is that at least thirty employees were required to take the PPA in 2000, and that nearly all of them were *male.* (Pl.Ex. N.) Also, Defendants have provided evidence showing that the PPA was only

administered to new employees in 2001 because of a shortage of personnel qualified to administer the test (Mallard Dep. at 19–26), and it was reinstated for all firefighters in June 2002 (Jordan Dep. at 44; Sanders Dep. at 37–38). In short, there is no discernable unlawful pattern or practice from the record evidence, and the evidence that is capable of interpretation contravenes Plaintiff's claim.

In addition to the statistics, Plaintiff also relies on the incidents surrounding the November 2000 PPA as evidence of a pattern and practice of discrimination. On November 2, 2000 Plaintiff informed her supervisor, Ricky Ross, that she was going to be absent for elective surgery in December. (Bethel Dep. at 328.) She claims she was selected to take the PPA within days of telling Ross about her surgery, that she failed the PPA that day due to her medical condition, and that she should have been excused from performing the test. (Bethel Dec. ¶ 207.) However, Plaintiff admitted that her condition did not preclude her from performing her firefighting duties, nor taking the PPA. (Bethel Dep. at 326, 329.) She did not present any documentation from a physician that she had a medical condition that would preclude her from taking the PPA (Mallard Aff. ¶ 5; Porterfield Aff. ¶ 21; Ross Aff.¶ 5), and she did not advise any top management position that she was going to have surgery (Bethel Dep. at 327). Most importantly, on the day she was selected to take the PPA, she did not mention her condition nor request a grace period as she was entitled to do.[24] (Bethel Dep., Ex. 31.)

---

**23.** Mallard, Sanders, and Jordan all testified that all firefighters who did not resign during the year were required to take the PPA in 2000 (Mallard Supp. Aff. ¶ 7; Sanders Aff. ¶ 7; Jordan Aff. ¶ 7); and there is no testimony from any full time firefighter stating that he or she was excused from taking the PPA in 2000.

**24.** A May 12, 2000 BEMA memorandum states that:

"When the computer selects an employee's number and the employee feels that they need to have a physical done previous to the annual evaluation they may request that the PPA be delayed until they have a physical performed. The employee will be given

Additionally, there is no evidence that Plaintiff was treated disparately after she failed the test in 2000. She claims that male employees who had a physical ailment were given special assignments that were exempt from the PPA until they recovered (Jordan Dep. at 45–46; Sanders Dep. at 39); and that there was an open PPA-exempt position available when she failed the PPA, but it was not offered to her. (Jordan Dep. at 36–37). Defendants have presented evidence, however, that no such position was available (Porterfield Supp. Aff. ¶ 14), and that even if it were, Plaintiff did not apply for nor express an interest in it. (Bethel Dep. at 353–54.) Accordingly, Plaintiff has failed to show that she was treated differently with respect to her 2000 PPA.

In conclusion, Plaintiff has not presented any evidence, anecdotal nor statistical, that gender discrimination is the standard operating procedure at BEMA, nor that Defendants have a pattern or practice of discriminating against women.

### 3. Disparate Impact

■ "Disparate impact is a doctrinal surrogate for eliminating unprovable acts of intentional discrimination hidden innocuously behind facially-neutral policies or practices." *Joe's Stone Crab, Inc.*, 220 F.3d at 1274. Claims of disparate impact "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot

be justified by a business necessity." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (citations omitted). The framework for a disparate impact claim under Title VII requires that a plaintiff establish the following elements: 1) a specific employment practice that allegedly has a disproportionate impact and 2) statistical evidence sufficient to show that the practice in question has resulted in prohibited discrimination. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). If the plaintiff establishes a prima facie case, the employer can then respond with evidence that the challenged practice is both related to the position in question and consistent with business necessity. *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1314 (11th Cir.1999) (citations omitted). In this case, Plaintiff relies on BEMA's use of the PPA as support for her disparate impact claim.[25]

■ This same claim was asserted by Plaintiff and found lacking by this Court in *Bethel I*.[26] (Order of November 8, 1999 at 23–25.) However, because the Court in *Bethel I* only considered whether there was evidence of disparate impact through 1998, I will analyze Plaintiff's present allegations that the PPA had a disparate impact on women in 1999 through 2002. To establish a prima facie case, Plaintiff must show that of the employees selected to take the PPA, the percentage of women

---

a two-week grace period to obtain a physical before being required to perform the PPA."
(Bethel Dep., Ex. 31.)

**25.** Plaintiff also appears to allege discrimination in Defendants' promotion practices and the TMT; however, these claims are barred by res judicata. They were addressed in *Bethel I* and found insufficient to establish a prima facie case of discrimination. (Order of November 8, 1999.)

**26.** This Court held that "Plaintiffs' response does not establish a case of disparate impact.... Even if Plaintiffs have made a prima facie showing of disparate treatment, summary judgment is still appropriate because Plaintiffs have no evidence to rebut Defendant's affirmative defense. Defendant has shown that the PPA tests skills needed in the course of firefighting." (Order of November 8, 1999 at 24–25.)

who fail it is significantly greater than the percentage of men who fail it. *Nash v. Consolidated City of Jacksonville, Duval County, Fl.,* 905 F.2d 355, 358 (11th Cir. 1990); *see also Wards Cove Packing Co. Inc. v. Atonio,* 490 U.S. 642, 655–56, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Although Plaintiff has offered evidence showing that only nine out of ninety-seven employees took the PPA in 1999; only thirty-three out of ninety-six took the PPA in 2000; only new employees took the PPA in 2001; and only seventy out of 104 employees took the PPA in 2002 (Pl. Br. at 34), she has referred the Court to no evidence showing that more women than men failed the test, or even that more women than men were required to take the test.

Even assuming Plaintiff could establish a prima facie case, Defendants have shown that the PPA is related to the position of firefighter and consistent with business necessity (Porterfield Aff. ¶ 16). Plaintiff has failed to rebut this evidence. Plaintiff asserts that the PPA, particularly the "dummy-drag," goes beyond what is reasonably required for a firefighter and sets a "Herculean bar" for women. (Pl. Sur–Reply Br. at 12.) As support for her claim, she cites the OSHA regulation for firefighters that no firefighter should enter a burning structure alone and there must be two or more people outside the structure as well. 29 C.F.R. § 1910.134(g)(4)(i-iii). Plaintiff claims that the dummy drag, which requires that one person drag the 165 pound dummy one hundred feet without stopping (Pl. Sur–Reply Br. at 12), is contrary to this regulation. Plaintiff, however, is mistaken. There has been no finding that the PPA is contrary to federal regulations, and it is easy to imagine a situation where the dummy drag would be useful practice for firefighting emergencies. For example, after two firefighters enter a structure, one may become injured or incapacitated, and the other would need to be able to drag his or her partner to

safety. Plaintiff has failed to show that the PPA has a disparate impact on women, and summary judgment for Defendants on this claim is appropriate.

## C. Retaliation Claims

Plaintiff alleges that her demotion and having to take the PPA in November 2000 were the result of unlawful retaliation. It is unlawful to retaliate against employees who file charges with the EEOC. 42 U.S.C. § 2000e–3(a); *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1455 (11th Cir.1998). To establish a prima facie case of unlawful retaliation, a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two events. *Wideman,* 141 F.3d at 1454. If "a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant" to produce "legitimate reasons for the adverse employment action." *Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1155 (11th Cir.2002) (citation omitted) (internal quotation marks omitted). If the defendant does so, the plaintiff must then demonstrate that the employer's explanation is a pretext for retaliation. *Id.* However, even if the plaintiff provides evidence that the defendant was motivated in part by an impermissible consideration, the defendant can prevail if it can prove by a preponderance of the evidence that it would have made the same decision even in the absence of the discriminatory consideration. *Pulliam v. Tallapoosa County Jail,* 185 F.3d 1182, 1184 (11th Cir.1999).

### 1. Demotion

It is clear that the EEOC charge that Plaintiff filed is a protected activity, *Wideman,* 141 F.3d at 1455, and her demotion is an adverse employment

action. To prove a causal connection between these two, Plaintiff must show only that the "protected activity and the adverse action were not wholly unrelated." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir.1999). The usual way of showing a causal connection is through evidence of a temporal relationship. *E.g., Maniccia v. Brown*, 171 F.3d 1364, 1369–70 (11th Cir.1999) (discussing time gaps in retaliation cases). In these cases, the temporal proximity must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citations omitted). Plaintiff filed EEOC charges in May 1998, June 1998, and December 1998;[27] and commenced the first lawsuit against Porterfield in December 1998. (Bethel Dec. ¶¶ 18, 19, 24, 26, 103, 204.) She was demoted in August 1999. (Bethel Dec. ¶¶ 163, 164.) This gap of nearly eight months does not give rise to an inference of discrimination in and of itself. *See Maniccia*, 171 F.3d at 1370 (citations omitted). However, Plaintiff also relies on the fact that Porterfield learned of Plaintiff's alleged misconduct during a deposition for *Bethel I* and, based on that conduct, demoted her a month later. These two events are not "wholly unrelated," and Plaintiff has met her burden of establishing a prima facie case of retaliation.

 Since Plaintiff has established a prima facie case, the burden now shifts to Defendants to establish non-retaliatory reasons for Plaintiff's demotion, or to prove that they would have taken the same action for a permissible reason alone, or by pursuing both tactics. *Pulliam*, 185 F.3d at 1186. As discussed earlier with regard to Plaintiff's claim of disparate treatment, Defendants have met their burden of presenting a legitimate, non-discriminatory reason for demoting Plaintiff. Furthermore, even if Plaintiff can show that the proffered reason was a pretext for discrimination, Defendants have carried their burden of proving that they would have taken the same action in the absence of an impermissible reason.

It is BEMA policy that alcohol may not be consumed on BEMA property. (Bethel Dep. at 63–66, Ex. 4.) As a captian, Plaintiff's duties included supervising the station and ensuring that all BEMA policies were followed. (*Id.* at 67.) Porterfield demoted Plaintiff based on his conclusion that she had engaged in serious misconduct by violating BEMA's alcohol policy. (Porterfield Aff. ¶ 9.) Porterfield honestly believed that Plaintiff had allowed the consumption of alcohol at her station on multiple occasions based on Campbell's diary entries, her deposition testimony, and Plaintiff's deposition testimony from *Bethel I*. (*Id.* ¶ 4–7.) Because Campbell was a co-plaintiff in the first suit against Porterfield, he did not reasonably believe that she would make allegations against Plaintiff that were untrue. (*Id.*) Even if, as she alleges, Plaintiff did not commit the violation with which she is charged, if Porterfield honestly believed she allowed the consumption of alcohol on BEMA premises more than once, he is not guilty of discrimination. *See Jones*, 874 F.2d at 1540. Since BEMA had a "zero tolerance policy" with respect to knowing violations of the alcohol policy (Porterfield Aff. ¶ 9), it is admittedly disturbing that Porterfield did so little to discipline Mrs. Kitchens; and Plaintiff makes much of this fact. However, Mrs. Kitchens was off-duty when the events occurred; was apparently not aware that it was contrary to BEMA policy to consume alcohol on BEMA premises,

---

27. Plaintiff also filed a charge in March 2000, although ti was originally attached to an earlier charge filed in September 1999. (Bethel Dep. ¶¶ 176–177, 204.) Either way, this last charge was filed after the demotion and is therefore inconsequential.

even when off-duty; and was a dispatcher, so that there was no full-time position into which to demote her. (Porterfield Supp. Aff. ¶ 6.) If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown. *Jones*, 874 F.2d at 1540 (citations omitted) (quotations omitted). Defendants have successfully carried their burden of showing that Porterfield demoted Plaintiff for a permissible reason and would have done so regardless of whether Plaintiff was able to demonstrate another, retaliatory motive.

■ Since Defendants are entitled to summary judgment on Plaintiff's claim that her demotion was a result of retaliation, they are similarly entitled to summary judgment on her claim that the failure to receive a merit pay increase was a result of retaliation. As discussed, *supra*, Plaintiff was denied a merit pay increase because she had been demoted that year. Her demotion was lawful, and the denial of a merit pay increase was lawful as well.

### 2. PPA

Defendants contend that Plaintiff cannot establish a prima facie case of retaliation based on having to take the PPA because: 1) being required to take the PPA does not constitute an adverse employment action; and 2) there is no casual connection between her EEOC charges or previous suit and being required to take the PPA on November 8, 2000.

■ "While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does consti-

tute adverse action under Title VII." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1118 (11th Cir.2001) (citation omitted)(internal quotation marks omitted). Defendants equate the PPA to random drug testing and assert that because the PPA is performed in a routine fashion, following regular and legitimate practices, requiring Plaintiff to take the PPA as a condition of employment is not an adverse action. *See Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001–02 (7th Cir.2000).

■ In order to ensure firefighters maintain an appropriate level of physical conditioning, BEMA requires that all full-time BEMA employees whose job duties involve firefighting take and pass the PPA once a year. (Bethel Dep., Ex. 31.) Beginning in September 1998, firefighters were randomly selected to perform the PPA through a computer program. (*Id.*, Ex. 30.) At any time a captain could run the computer program, which would generate a list of employees' names in random order. (Matthews Dep. at 9.) Each time a list was generated, the names would be in a different order. (*Id.* at 12.) The list was then given to the duty chief. (*Id.*) Although not entirely clear, it appears that the employee at the top of the list would then be required to take the PPA.[28] (*Id.*) In May 2000, the policy was modified to provide that, if an employee was randomly selected by the computer to perform the PPA, the employee could request and receive a two-week grace period to obtain a physical before he or she was required to take the PPA. (Bethel Dep. at 31.) If an employee failed the PPA, he or she could retake it again within two weeks without penalty. (Bethel Dep., Ex. 29.)

---

**28.** Captain Matthews testified that he would print a list and give it to a duty chief, but that he had no idea how a name was selected after that. (Matthews Dep. at 12–13.) For Chief Mallard, however, Matthews would print only the first two or three names from the list.

(Matthews Supp. Aff. ¶ 6; Mallard Dep. at 16.) Chief Jordan testified that to select an employee for the PPA, someone would go to the computer, "hit the key, and whoever's name came up would take it." (Jordan Dep. at 22.)

When viewed in the light most favorable to Plaintiff, it is possible that, although the names were generated in random order, any employee's name could be chosen from the list. However, because an employee could receive a two-week grace period before having to take the test, and a two-week grace period to retake the test if he or she had failed it, there is no evidence that simply selecting Plaintiff to take the PPA on November 8, 2000 is an adverse employment action "that alters an employee's compensation, terms, conditions, or privileges of employment." *Bass,* 256 F.3d at 1118. Although she claims that she had a medical condition that precluded her from successfully completing the November PPA, there is no evidence that Plaintiff gave her superiors documentation of her ailment, nor that she requested two weeks to obtain a physical examination. (Bethel Dep. at 331–32.) She took the PPA, without objection, the day she was selected. Furthermore, after failing the PPA, she did not attempt to retake it because she "didn't feel up to it." (*Id.* at 337.) Since Plaintiff has failed to establish that being required to take the PPA is an adverse employment action, there is no need to further analyze whether Plaintiff has met the remaining elements of a prima facie case of retaliation. Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

### D. Hostile Environment and/or Constructive Discharge Claim[29]

In her brief filed in response to Defendants' motion for summary judgment, Plaintiff repeatedly states that Porterfield created a generally hostile environment for female employees at BEMA. (*See* Doc. No. 57 at 2, 38.) In support of her claims, she articulates the standard for both hostile

environment and constructive discharge. (*Id.* at 39–40.) Neither of these claims was a part of her EEOC charge, nor alleged in her complaint or amended complaint; and the hostile environment claim was apparently abandoned in her sur-reply brief. (*See* Doc. No. 70 at 3 (stating the circumstances surrounding the PPA in November 2000 were "a matter of constructive termination . . . but not a 'hostile environment' claim in the sexuality sense").)

Even assuming the claim of constructive discharge is viable, Plaintiff has failed to show that the working conditions at BEMA were so difficult or unpleasant that a reasonable person would have felt compelled to resign. *Wardwell v. Sch. Bd. of Palm Beach County, Fl.,* 786 F.2d 1554, 1557–58 (11th Cir.1986). Although she states that her demotion led to depression, which in turn impacted her performance on the 2000 PPA, Plaintiff has not referred the Court to evidentiary support for these assertions. While Plaintiff may have been embarrassed by her demotion and frustrated by her failure of the PPA, these simply do not rise to the level of intolerable working conditions. *Id.* Defendants are entitled to summary judgment on Plaintiff's claim of constructive discharge.

### E. Age Discrimination Claims

Finally, Plaintiff claims that she was treated disparately under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* because men younger than 40 were promoted to a Training Officer or Duty Chief position. The ADEA makes it unlawful to discriminate against an employee because of her age. 29 U.S.C. § 623(a)(1). An ADEA prima facie case may be established in one

---

**29.** Although this Court held that Plaintiff's evidence was insufficient to sustain a hostile environment claim in *Bethel I* (Order of November 8, 1999 at 15), she appears to rely on events that occurred after her first suit as support for the present allegations of a hostile environment.

of three ways. *Brown v. American Honda Motor Co.* 939 F.2d 946, 949 (11th Cir.1991) (Title VII); *see also Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267 n. 6 (11th Cir.2001) ("it is now widely accepted that the [*McDonnell Douglas* ] framework applies to claims of discrimination under the ADEA"). Plaintiffs can present direct evidence, statistical evidence, or circumstantial evidence, i.e., the *McDonnell Douglas* framework. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir.1989). Plaintiff offers no direct or statistical evidence, but contends that circumstantial evidence establishes a prima facie case.

■ In age discrimination claims based on circumstantial evidence, Plaintiff must satisfy a four-part prima facie requirement: 1) that she was a member of the protected group of persons between the ages of forty and seventy; 2) that she was subject to an adverse employment action; 3) that a substantially younger person filled the position that she sought or from which she was discharged; and 4) that she was qualified to do the job for which she was rejected. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.1998) (citations omitted). Plaintiff has failed to establish a prima facie case of age discrimination because she has not shown that a substantially younger person filled the position that she sought.

■ Plaintiff claims that in September 1998 she requested a position that would exempt her from the PPA, but that Porterfield unlawfully gave those positions to younger men that were less qualified than Plaintiff. (Pl. Brief in Response at 41.) Specifically, Plaintiff contends that Willie Jordan, Kerry Mallard, Steven Matthews, and Jeff Johnson were all promoted to Training Officer Positions. Plaintiff's claim fails for several reasons.

First, Plaintiff has not shown that the named comparators are substantially younger than she. According to her EEOC Charge, Plaintiff is presently 50 years old. (*See* EEOC Charge attached to Amended Complaint.) Jordan is 50 years old (Jordan Aff. ¶ 3), Mallard is 52 years old (Mallard Supp. Aff. ¶ 3), and the Court has not been given any evidence of the ages of Matthews and Johnson.

Second, Plaintiff did not seek a PPA-exempt position. After failing the PPA in 1998, she asked if there were any PPA-exempt positions available. (Pl.Ex.Q.) She was told there were no open positions that she was qualified for and she should check back in a few days.[30] (*Id.*) There is no evidence that she checked back later and no record of her ever applying for one of the positions she asked about. (*Id.*) Lacking any other evidence of age discrimination, no reasonable jury could find for Plaintiff. Defendants are entitled to summary judgment on Plaintiff's ADEA claim.

### IV. CONCLUSION

For the reasons given above, Defendants' Motion for Summary Judgment (Doc. No. 24) is **GRANTED**. The clerk is instructed to **CLOSE** this case and **ENTER FINAL JUDGMENT** in favor of Defendants. Costs are taxed against Plaintiff.

---

**30.** Plaintiff claims that Porterfield was lying when he said no positions were available at that time because Jeff Johnson left his position as a training officer in August 1998. However, Porterfield actually stated that "we are not going to fill any slots in the training division" (Pl.Ex.Q) and at the time of that conversation, a secretary had been hired to perform some of the duties Johnson was responsible for. (Porterfield Supp. Aff. ¶ 13; Aff. of Jayne Brinson ¶ 2.)